UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
FRANTZ MICHEL,                          )
                                        )
            Plaintiff,                  )
                                        )
            v.                          )            Civil Action No. 17-11099-LTS
                                        )
NATIONAL GRID USA SERVICE               )
COMPANY, INC.,                          )
                                        )
            Defendant.                  )
_____)

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[Docket No. 106]

November 30, 2020

Boal, M.J.

Pro se plaintiff Frantz Michel[1] alleges that defendant National Grid USA Service

Company, Inc. ("National Grid") discriminated against him on the basis of a disability, his race,

and his national origin in violation of Massachusetts law.  He also alleges violations of the

Family Medical Leave Act of 1993 ("FMLA").  In addition, he alleges that National Grid

retaliated against him in violation of Massachusetts law and the FMLA.  National Grid has

moved for summary judgment on all of Michel's claims.  Docket No. 106.[2, 3]  I heard oral

_____

[1] Michel was represented in this action by Attorney Suzanne L. Herold until July 11, 2019, when
Judge Sorokin granted her motion to withdraw as counsel.  See Docket No. 59.

[2] On October 18, 2019, Judge Sorokin referred this case to the undersigned for full pretrial
management, including report and recommendation on dispositive motions.  Docket No. 72.

[3] Citations to "Docket No. ___" are to documents appearing on the Court's electronic docket.
They reference the docket number assigned by CM/ECF, and include pincites to the page
numbers appearing in the top right corner of each page within the header appended by CM/ECF.

argument on November 18, 2020.  For the following reasons, I recommend that Judge Sorokin grant in part and deny in part the motion.

I.      PROCEDURAL BACKGROUND

Michel filed his complaint in Massachusetts Superior Court on April 26, 2017.  See Docket No. 9 at 6.  National Grid removed the case to this Court on June 14, 2017.  Docket No. 1.

On June 30, 2020, National Grid filed the instant motion for summary judgment.  Docket No. 106.  On July 21, 2020, Michel filed his response.  Docket No. 116.  National Grid filed a reply on August 3, 2020.  Docket No. 117.

Michel failed to file a response to National Grid's Rule 56.1 Statement of Undisputed Facts.  Because he is proceeding pro se, I allowed him an opportunity to file a response that complied with both Local Rule 56.1 and this Court's Scheduling Orders (Docket Nos. 99, 104). See Docket No. 118.  Michel was specifically warned that failure to comply "may result in the Court deeming the Defendant's Statement of Facts admitted for purposes of the motion for summary judgment."  See id.

On September 4, 2020, Michel filed a Separate Statement of Items in Dispute Filed Concurrently With His Opposition to Defendant's Motion for Summary Judgment.  Docket No. 119-1.  He only disputed 12 of National Grid's 89 statements of fact.  He also refiled his opposition to National Grid's motion for summary judgment and his affidavit.[4]  Docket No. 119-

_____

[4] National Grid argues that Michel's affidavit should be disregarded because it contains no record citations and "constitutes nothing more than baseless argument."  Docket No. 117 at 3. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  While some portions of Michel's affidavit are not based on personal knowledge and/or constitute nothing more than argument and/or speculation, other portions relay his recollection of relevant events

2; Docket No. 120.  On September 16, 2020, National Grid filed a Reply in Further Support of

Defendant's Motion for Summary Judgment, responding to Michel's September 4, 2020 filing.

Docket No. 121.

II.     FACTS[5]

    A.     Relevant Company Background

National Grid is one of the largest investor-owned energy companies in the United

States.[6]  It provides electricity and natural gas services to more than 20 million customers

throughout Massachusetts, Rhode Island, and New York.[7]

National Grid divides its employees among the "gas group" and the "electric group."[8]  It

is not uncommon for employees to transfer internally from one group to the other, as appropriate

opportunities become available.[9]  Although the hierarchical structure has changed somewhat

---

and are appropriately considered in connection with National Grid's motion for summary
judgment.  See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir.
2000) (citations omitted) (A "party's own affidavit, containing relevant information of which he
has first hand knowledge, may be self-serving, but it is nonetheless competent to support or
defeat summary judgment.").

[5] The facts are taken from National Grid's Statement of Undisputed Material Facts in Support of
Defendant's Motion for Summary Judgment (Docket No. 108) ("SOF"), Plaintiff's Separate
Statement of Items in Dispute Filed Concurrently With His Opposition to Defendant's Motion
for Summary Judgment (Docket No. 119-1) ("Resp.") and, where appropriate, from the Affidavit
of Frantz Michel (Docket No. 116) ("Michel Aff.").  Because this case is before the Court on a
motion for summary judgment, this Court sets out any properly disputed facts in the light most
favorable to Michel, the nonmoving party, and resolving all reasonable inferences in his favor.
See Clarendon Nat'l Ins. Co. v. Philadelphia Indemnity Ins. Co., 954 F.3d 397, 403-404 (1st Cir.
2020) (citations omitted).

[6] SOF ¶ 1.

[7] Id.

[8] SOF ¶ 2.

[9] Id.

throughout the years, over the last decade, there have been various tiers of Project Managers (e.g., Associate Project Manager, Lead Project Manager).[10]  Leadership in the project management sphere is made up of managers and directors.[11]  Whereas project managers are responsible for discrete projects, managers and directors are responsible for overseeing, supporting, and delegating.[12]

For purposes of promotion consideration, National Grid reviews each internal candidate's education level, qualifications, and prior work history.[13]  National Grid maintains regimented mechanisms for internal promotions.[14]  As a general practice, National Grid places specific emphasis on individuals' performance at National Grid (as opposed to their background outside of the Company) when considering whether to award a specific promotion.[15]  National Grid rarely, if ever, promotes employees more than one level in one move.[16]

B.     Michel

Michel is Black.[17]  He was born in Haiti.[18]  While he speaks English well, he has a heavy

---

[10] SOF ¶ 3.

[11] Id.

[12] Id.

[13] SOF ¶ 4.

[14] Id.

[15] Id.

[16] Id.

[17] Michel Aff. at ¶ 2.

[18] Id.

accent.[19]  Michel suffers from severe acute myopia.[20]  He has received treatment for this

condition, including several surgeries.[21]  He has also received treatment for a retinal

detachment.[22]  In addition, Michel suffers from chronic back pain.[23]

      C.     Michel's Employment At National Grid

National Grid hired Michel in October 2008 as a project manager in the New England

Distribution Project Management Department.[24]  As a project manager, Michel was responsible

for managing specific projects for National Grid customers in New England in order to ensure

that the projects were completed on a timely basis, on budget, and in a safe manner.[25]

National Grid alleges that, from 2008 through 2014, Michel's performance remained

mostly stagnant, with no serious cause for concern.[26]  It maintains, however, that there were

some early, but minor, warning signs of performance deficiencies, which would become more

pronounced later on.[27]  For example, in his first year-end review (for the end of 2008 and 2009),

---

[19] Id.

[20] Id. at ¶ 3.

[21] Id.

[22] Id.

[23] See Michel Aff. at ¶¶ 7, 10.

[24] SOF ¶ 5.  National Grid alleges that Michel was hired in Waltham, Massachusetts while Michel states that he was hired in Westborough, Massachusetts.  SOF ¶ 5; Resp. ¶ 5.  It does not appear that this dispute is material.

[25] SOF ¶ 6.

[26] SOF ¶ 7.

[27] Id.  Michel has not disputed this fact in his response but has stated in his affidavit both that he never received an under-average review during the first six years of employment at National Grid and that he never received any performance review for six years.  See Michel Aff. at ¶¶ 17-18.

Daniel Glenning, Michel's then-supervisor, noted that Michel had failed to consistently demonstrate an ability to build relationships with his colleagues.[28]  Internal relationship building was especially important in project management at National Grid because alignment and collaboration among team members is required in order to identify and focus on customers' specific needs and wants.[29]

National Grid alleges that Glenning attempted to coach Michel with respect to another performance problem he had observed: Michel's poor communication skills.[30]  Michel denies that he ever received any coaching from Glenning.  Rather, he maintains that he often complained to National Grid's Human Resources Department that Glenning neglected to provide any guidance.[31]  According to Michel, performance review sessions with Glenning never lasted more than five minutes.[32]  Those meetings consisted of no other agenda or purpose aside from Glenning informing Michel of his new pay rate.[33]  Glenning always told Michel that his performance was fine.[34]

According to National Grid, Michel's performance issues arising from his weaknesses in relationship building and communication, though somewhat concerning, were not particularly pronounced in his role as project manager, because he had no supervisory responsibilities and

---

[28] SOF ¶ 8.

[29] SOF ¶ 9.

[30] SOF ¶ 10.

[31] Resp. ¶ 10.

[32] Id.

[33] Id.

[34] Id.

less accountability than a manager or director level employee would have had.[35]  As a result, Michel's performance as a project manager remained largely up to National Grid's standards for the next several years.[36]

Throughout his tenure at National Grid, Michel applied for and received several different positions, leading to placements on a variety of teams (both within the gas group and the electric group), and with several different supervisors.[37]  He worked sufficiently well as a project manager and demonstrated good technical skills, but did not exhibit any of the specific strengths or skill sets that National Grid looks for in manager or director-level employees, such as demonstrated appreciation for the bigger picture, strong team ethic, leadership, and good communication skills.[38]

In late 2013, Michel began reporting directly to Timothy Moore, who is Black.[39]  Moore has been employed by National Grid since 2005.[40]  In 2013, when Moore became Michel's direct supervisor, he was a manager of project management in the electric group.[41]  Michel worked under Moore's direction for approximately six months, during the first half of 2014.[42] During this time, Moore recommended Michel to manage a very high profile and important gas

---

[35] SOF ¶ 12.

[36] SOF ¶ 13.

[37] SOF ¶ 14.

[38] SOF ¶ 15.

[39] SOF ¶ 16.

[40] SOF ¶ 17.

[41] Id.

[42] SOF ¶ 18.

liquefier project.[43]  Michel took on this new responsibility and continued to perform adequately his job as project manager.[44]

In July 2014, National Grid hired Cedric Williams, who is Black, as a new Vice President.[45]  Williams was tasked with starting the Project Management and Complex Construction group.[46]

In early 2015, Michel applied for a director role within that group, which would have been a jump two levels upward.[47]  Williams invited Michel to interview for a manager position instead of the director role.[48]  Following the interview, Williams promoted Michel to Manager of Project Management, effective February 1, 2015.[49]   As manager of project management, Michel was given significantly increased responsibility (with a corresponding salary increase[50]), and he was initially assigned one direct report.[51]

Williams continued to interview candidates for the director position, which would be

---

[43] SOF ¶ 19.

[44] SOF ¶ 20.

[45] SOF ¶ 21.

[46] Id.

[47] SOF ¶ 22.

[48] SOF ¶ 24.

[49] Id.

[50] Upon his promotion in February 2015, Michel's salary was increased by seven percent. National Grid inadvertently failed to implement the increase, but did so retroactively in or around July 2015 after Michel raised the issue with Christine Lynch in June 2015.  SOF at ¶ 27, n. 1.

[51] SOF ¶ 27.

responsible for directly overseeing Michel's role and the rest of project management.[52]  Williams

eventually hired Moore to fill the director position.[53]  As director, Moore became responsible for

two direct reports, Michel and another manager of project management, as well as all of their

direct reports.[54]  Moore had very high expectations and was a results-driven supervisor.[55]

During and immediately after the formation of the new Project Management and

Complex Construction group, National Grid employees became aware of an impending

company-wide hiring freeze.[56]  As a result, Michel needed to act quickly to hire new project

managers.[57]  Instead, Michel drafted a complicated and multi-step hiring plan, which he sent to

Moore.  Notwithstanding Michel's awareness that he needed to hire project managers quickly

due to the impending hiring freeze, his plan did not project any actual hires until months later.[58]

Moore felt that Michel's hiring plan was too "elaborate" and "detailed."[59]  Given the time

constraints, Moore expected Michel to have initiated a direct conversation about hiring, instead

of taking time away from his already busy schedule to craft an unnecessary and lengthy written

plan.[60]

---

[52] SOF ¶ 25.

[53] Id.

[54] SOF ¶ 26.

[55] SOF ¶ 28.

[56] SOF ¶ 29.

[57] Id.

[58] SOF ¶ 30.

[59] SOF ¶ 33.

[60] Id.

Notwithstanding the hiring plan, Michel failed to identify and hire candidates to join his team.[61]  He hedged on acceptable candidates, and drew out the hiring process unnecessarily.[62]  As a result, Michel was unable to make any new hires before the hiring freeze went into effect.[63]

Michel immediately began to struggle with his new, increased level of responsibility.[64]  His new duties pivoted his focus from distinct and specific project management to a more holistically managerial role.[65]  He was now responsible for overseeing the project management itself, and supporting his direct report.[66]  A major function of this role was to communicate reports and updates on New England projects, and to draft presentations for Moore to present to higher ups.[67]

National Grid alleges that Michel did not perform his new duties to Company standards.[68]  For example, National Grid maintains that there were many occasions in 2015 when Michel would simply leave projects hanging and miss deadlines, forcing Moore to check in and follow up with him to ensure task completion.[69]  Many of the missed deadlines pertained to large

---

[61] SOF ¶ 34.

[62] Id.

[63] Id.

[64] SOF ¶ 35.

[65] SOF ¶ 36.

[66] Id.

[67] Id.  Michel disputes this fact by stating that he was not Moore's administrative assistant, see Resp. ¶ 36, but nowhere does National Grid allege that Michel was Moore's administrative assistant.

[68] SOF ¶ 37.

[69] Id.

and significant projects, which resulted in ultimately late and over-cost deliveries.[70]  In addition, Michel's submissions to Moore often failed to meet the mark, and were not presentation-ready (i.e., either unfinished or including inaccurate facts), which required Moore to do a significant amount of work to correct and revise Michel's submissions.[71]  National Grid also alleges other deficiencies in Michel's work performance, including that he failed to take accountability for the New England Complex Projects, missed meetings, and failed to take any kind of accountability for his direct reports.[72]

Michel maintains that there was only one instance when he submitted a late report to Mr. Moore.[73]  According to Michel, he had earlier promised Moore that the report would be finished by 1:00 p.m.[74]  He submitted the report just two minutes after 1:00 p.m.[75]  Moore then proceeded to give him an unnecessary 2-hour lecture about the report being late.[76]

In addition, National Grid alleges that Michel continued to struggle with clear and concise communication, especially with respect to the status of his assigned projects.[77]  Michel

---

[70] SOF ¶ 39.

[71] SOF ¶ 38.

[72] SOF ¶¶ 42-44.

[73] Resp. ¶ 37.

[74] Id.

[75] Id.

[76] Id.  Michel also alleges that that on another occasion, Moore returned to him a 35-page Power Point presentation to edit it to replace a comma with a semi-colon.  See Michel Aff. at ¶ 36.  He appears to suggest that this minor incident is being used by National Grid to fabricate a case of poor performance.  See id.  However, he has not disputed National Grid's statement of fact number 38 regarding unfinished or inaccurate work or stated that this incident was the only incident involving inaccurate work.

[77] SOF ¶ 45.

sent ambiguous and noncommittal email messages that did not provide the information requested and needed by Moore and Williams.[78]  As a manager, Michel's communication deficiencies became particularly pronounced.[79]  For example, though customers and other National Grid employees relied specifically on Michel to clearly communicate the status and forecasts for particular projects, he often provided ambiguous, indirect, and unclear updates, which left people with more questions than answers.[80]  As a result of Michel's communication deficiencies, Moore and Williams were often left without necessary information as they went into important meetings with other stakeholders within National Grid.[81]

When Michel did attempt to take leadership responsibility and assume more of a managerial role, he often did so in an inappropriate manner.[82]  Michel spoke to people in a way that was perceived as rude, disrespectful, demeaning, and at times inappropriately aggressive.[83]

During 2015, Moore had regular meetings with Michel to discuss his performance, and suggest areas for improvement.[84]  During these conversations, Michel was defensive, and argued against Moore's constructive criticism.[85]

---

[78] Id.

[79] SOF ¶ 46.  Michel denies this statement but points to no evidence to dispute it.  Resp. ¶ 46.

[80] Id.

[81] SOF ¶ 47.

[82] SOF ¶ 48.

[83] Id.

[84] SOF ¶ 49.

[85] Id.

In late 2015, the hiring freeze was lifted.[86]  Even so, Michel struggled to move the ball forward and Moore often had to follow up with Michel to check on the status of individual candidates.[87]

D.     The Performance Improvement Plan

After approximately nine months of observing Michel's performance in a manager role, with no noticeable improvement, Moore decided, in consultation with Human Resources, to issue a performance improvement plan ("PIP").[88]  In December 2015, Moore presented Michel with the PIP.[89]  Initially, Michel argued against the PIP and refused to sign it.  He ultimately accepted the PIP and signed it in January 2016.[90]

The PIP set forth expectations for four categories of performance where Michel struggled: managing employee issues, meeting deadlines, quality and accuracy of information and assignments, and communication and interaction with project personnel.[91]  For each category, Moore provided specific details regarding his expectations for improvement and the timeline for said improvement.[92]  Moore explained to Michel that the PIP was intended to assist Michel in improving his managerial skills, and that National Grid required such improvement.[93]

---

[86] SOF ¶ 50.

[87] Id.

[88] SOF ¶ 51.

[89] SOF ¶ 52.

[90] Id.

[91] SOF ¶ 53.

[92] Id.

[93] SOF ¶ 54.

Michel states that National Grid's allegations about the PIP are an "entire fabrication of the Defendant."[94]  According to Michel, while Moore did present a PIP document to him, Moore said that he found the document on the Internet and that the document would help them keep track of their conversations.[95]  Michel alleges he specifically asked Moore if the document was a PIP and Moore said that it was not.[96]  Moore represented to Michel that a PIP was not necessary because Michel's performance level was not low enough to need one.  Moore begged Michel to sign it and insisted that signing it was not a big deal.[97]  Michel returned the document to him unsigned by email explaining that he was not in agreement with anything in it.[98]  It appears that Michel eventually did sign the PIP.[99]

According to National Grid, at first, Michel appeared to take the PIP to heart, and engaged with Moore in such a way that suggested he was trying to follow the specific instructions and guidance in order to improve his managerial skills and work performance.[100]  This led Moore to be optimistic that Michel would make significant improvements in his performance.[101]  Michel's performance, however, did not improve.[102]  He continued to miss

---

[94] See Resp. ¶ 61; Michel Aff. at ¶ 38.

[95] Michel Aff. at ¶ 38.

[96] Michel Aff. at ¶ 39.

[97] Id.

[98] Id.

[99] Docket No. 117 at 11-12.

[100] SOF ¶ 56.

[101] Id.

[102] SOF ¶ 57.

important deadlines, misalign priorities, deliver low quality and/or factually inaccurate work product, and struggle with clear and concise communication.[103]

Moore continued to provide both written and verbal feedback to Michel throughout the first half of 2016.[104]  During one of those discussions, Moore told Michel that his communication skills were raising questions and causing confusion for other leaders at National Grid.[105]  Specifically, Moore told Michel that his tendency to hedge and add ambiguity instead of providing direct answers and clear information was becoming more of a problem.[106]  Moore told Michel that he needed to work on communicating directly and with confidence.[107]  He also asked that Michel refrain from giving key updates to certain upper-level management for the time being, until he was able to demonstrate that he was in a position to do so clearly and concisely.[108]

In early June 2016, Moore delivered Michel's mid-year review, and discussed his lack of progress on the PIP.[109]  In the written 2016 review, Moore noted that in his new role, Michel had "struggled to take accountability for the NE Complex Projects, often only focusing on his own projects or the few that he has previous background knowledge.  [Michel] often looks to deflect

---

[103] Id.

[104] SOF ¶ 58.

[105] SOF ¶ 59.

[106] Id.

[107] Id.

[108] Id.

[109] SOF ¶ 61.

responsibility for issues, and has trouble moving on from past issues."[110]  Moore also

commended Michel on his "wealth of knowledge in Project Management," but stated that he:

> struggles implementing this knowledge and leading his team well . . .
> [Michel] has been late on some of his deliverables, and often submits reports
> in order to make a deadline, yet not able to be used due to mistakes.
> [Michel] struggles to make a decision and often seems resistant to change
> or adjust to new deadlines or priorities.  He often looks to avoid being held
> accountable especially if he is not directly responsible for an action.[111]

Moore ended the review by asking Michel to, "[a]s a Manager . . . be [the] main point of contact

for the complex work in his area of responsibility."[112]  Per Moore, Michel failed to acknowledge

and appreciate the constructive criticism and instead argued with Moore about the review.[113]

    E.    The Second PIP And Michel's Medical Leave

Despite Michel's failure to improve his performance, Moore wanted to give him another

chance.[114]  He decided to provide Michel with a second PIP, this time with additional categories

for improvement.[115]  In addition to the prior four categories for improvement, Moore included

the following areas of improvement in the second PIP: project status and communication, project

schedules and timeline, and leadership and managing others.[116]  According to National Grid, the

second PIP further clarified the exact requirements necessary in order for Michel to keep his

---

[110] SOF ¶ 62.

[111] Id.

[112] Id.

[113] SOF ¶ 63.

[114] SOF ¶ 64.

[115] Id.

[116] SOF ¶ 65.

job.[117]

Before Moore was able to implement the second PIP, Michel called out of work several days in a row.[118]  On Friday, June 10, 2016, Michel sent a text message to Moore telling him that he was feeling unwell and would not be coming to work.[119]  Michel did not show up to work the following Monday and Tuesday, June 13 and 14, 2016.[120]  Moore texted Michel to ask when he was planning to return to work.[121]  Soon thereafter, Moore became aware that Michel intended to take longer-term sick leave.[122]

National Grid maintains that after Moore became aware that Michel was taking leave, he stopped contacting Michel to check on his status and instead communicated with the third-party sick leave coordinator.[123]  Moore did not ask Michel to do any work while he was out on leave.[124]  Michel acknowledges that he was not asked to do any work while on leave, but alleges that National Grid continually harassed him by calling his cell phone while he was in a psychiatric center and kept asking him when he would come back to work.[125]  According to Michel, Moore continued to call nonstop demanding to know when he was returning to work and

---

[117] SOF ¶ 66.

[118] SOF ¶ 67.

[119] Id.

[120] SOF ¶ 68.

[121] Id.

[122] SOF ¶ 69.  Michel remained out on leave for the next two months.  SOF ¶ 70.

[123] SOF ¶ 69.

[124] SOF ¶ 73.

[125] Resp. ¶ 73; Michel Aff. at ¶ 24.

once left a message indicating that he was going to replace him if he did not hear back from Michel about his return date.[126]  In addition, Michel alleges that as soon as he returned from FMLA leave, the manager accused him of being dishonest, saying that Michel took FMLA leave while not actually being sick.[127]  The manager also said that he intended to allow Brad Wheeler to take over Michel's position.[128]

Michel returned to work on or around August 8, 2016.[129]  On August 10, 2016, an administrative assistant informed Moore that Michel had expressed to her that he did not feel ready to be back at work and that he had experienced an anxiety attack upon his return.[130]  Concerned for Michel, Moore contacted Christine Lynch in Human Resources.  Lynch contacted National Grid's Employee Assistance Program ("EAP") and told Moore to issue a mandatory referral to Michel.[131]

Moore met with Michel on August 10, 2016 and discussed the mandatory EAP referral.[132]  Michel insisted that the referral was unnecessary and demanded to know who raised the issue.[133]  However, he did agree to comply with the EAP referral.[134]  Because the EAP

---

[126] Michel Aff. at ¶¶ 25-27.

[127] Michel Aff. at ¶ 30.  It appears that Michel is referring to Moore but he does not specify who he means by "the manager."

[128] Id.

[129] SOF ¶ 74.

[130] SOF ¶ 76.

[131] SOF ¶ 77.

[132] SOF ¶ 78.

[133] Id.

[134] Id.

process is independent and confidential, neither Moore nor Lynch had any personal knowledge as to what came of it.[135]   However, an EAP representative did communicate to Lynch within a few days that Michel was cleared to return to work.[136]   Thereafter, Michel continued to come to work as normal.[137]   He did not ask for any additional leave, nor did he request any other type of accommodation from National Grid.[138]

Though Moore had been eager to resume Michel's performance management track and deliver the second PIP, he decided to wait a few weeks before doing so.[139]   On August 31, 2016, Moore met with Michel to discuss his pre-leave performance and the second PIP.[140]   This time, Moore invited Lynch to attend.[141]   Moore gave Michel another two full months within which to bring his performance up to National Grid standards.[142]   The second PIP included a review date of November 1, 2016.[143]

F.     Michel's Termination

After delivering the second PIP, Moore continued to monitor Michel's performance,

---

[135] SOF ¶ 79.

[136] Id.

[137] SOF ¶ 80.

[138] Id.

[139] SOF ¶ 81.

[140] SOF ¶ 82.

[141] Id.

[142] SOF ¶ 83.

[143] Id.

which did not improve.[144]  Moore decided that Michel's failure to improve his performance over

the prior year suggested that any further performance management was unlikely to yield any

success.[145]  As such, on October 31, 2016, Moore scheduled a meeting with Michel to discuss his

performance for the following day, November 1, 2016, when Moore planned to terminate

Michel's employment for failing to achieve the goals set forth in the two PIPs.[146]

Michel did not come into work on November 1, 2016.[147]  On November 2, 2016 at 1:30

a.m., Michel called National Grid's 24-hour Alertline and filed an internal grievance, in which he

claimed that Moore and Williams had engaged in certain actions in "retaliation due to a salary

review the human resources department conducted at [Michel's] request."[148]  Specifically,

Michel claimed that Moore retaliated against him for initiating this request by "not permit[ing]

[Michel] to speak in public due to his accent, requir[ing] [Michel] to hire candidates for

employment with whom [Moore] is personally acquainted, issu[ing] highly unfair performance

evaluations to [Michel], issu[ing] instructions to [Michel's] subordinates without informing

[Michel], and increas[ing] the salaries of project managers who report directly to [Michel]

without increasing [Michel's] salary."[149]

Michel returned to work on September 2, 2016 but evaded Moore.[150]  Eventually, Moore

---

[144] SOF ¶ 84.

[145] SOF ¶ 85.

[146] Id.

[147] SOF ¶ 86.

[148] SOF ¶ 87.

[149] Id.

[150] SOF ¶ 88.

was able to locate Michel and, with the assistance of the Vice President of Human Resources,

terminated Michel's employment.[151]  National Grid investigated Michel's allegations in his

Alertline grievance and found they had no merit.[152]

      G.      <u>Michel's Allegations Of A Hostile Work Environment</u>

In his affidavit, Michel alleges that he was subjected to a hostile work environment for

the entirety of his employment at National Grid.  Michel Aff. at ¶ 15.  He does not, however,

elaborate but rather relies on the allegations in his complaint.  <u>See</u> <u>id.</u>  Because this is a motion

for summary judgment, Michel cannot merely rely on the pleadings; he must offer evidence in

support of his position.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-7 (1986)

(warning that the non-moving party may not simply "rest upon mere allegation or denials of his

pleading," but instead must "present affirmative evidence").

Based on his deposition testimony,[153] it appears that Michel is alleging a hostile work

environment based on "dismissive body language" from other employees at National Grid.[154]  In

addition, he alleges that Williams used the word "nigger" on several occasions, which made him

uncomfortable.[155]  According to Michel, Williams used the word in the context of stating that all

the Black employees in the gas group were going to be a "tight family" or "tight group."[156]

---

[151] <u>Id.</u>

[152] SOF ¶ 89.

[153] This Court notes that National Grid did not file a copy of the entire deposition transcript and Michel did not provide any additional excerpts he wished the Court to review.

[154] Docket No. 109-1 at 34.

[155] <u>Id.</u> at 36-38.

[156] <u>Id.</u> at 39.

In addition, Michel alleges that Williams made fun of his accent in public.[157]  Williams would also compare different accents and sometimes would speak in a fake accent.[158]  Michel also alleges that Williams and Moore specifically asked him not speak in public because of his accent.[159]

III.    ANALYSIS

    A.    Standard Of Review

Summary judgment is appropriate if the record, viewed in the light most favorable to the nonmoving party – here, Michel – "discloses 'no genuine issue of material fact' and [thus] demonstrates that 'the moving party is entitled to a judgment as a matter of law.'"  Zabala-De Jesus v. Sanofi-Aventis Puerto Rico, Inc., 959 F.3d 423, 427-428 (1st Cir. 2020) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).  A dispute is genuine where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (citation omitted).  A material fact is one with the "potential of changing a case's outcome."  Doe v. Trustees of Bos. College, 892 F.3d 67, 79 (1st Cir. 2018).  "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'"  Brandt v. Fitzpatrick, 957 F.3d 67, 75 (1st Cir. 2020) (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 116-117 (1st Cir. 2015)).

"A plaintiff opposing a properly documented summary judgment motion must carry 'the

---

[157] Id. at 41.

[158] Id. at 42.

[159] Id. at 51.

burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 60 (1st Cir. 2020) (quoting Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011)).  While the pleadings of a pro se litigant should be construed broadly, "even a pro se litigant must meet the specificity requirement of Federal Rule 56, at least when the litigant becomes aware that specific facts must be provided to defeat a motion for summary judgment." Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988).

> B.    Michel Has Failed To Raise A Triable Issue Of Fact Regarding His Claim That He Was Terminated Based On A Disability, His Race, And/Or National Origin

Michel alleges that he was terminated because of a disability,[160] his race, and/or his national origin in violation of the Massachusetts General Laws, Chapter 151B.[161]  See Complaint at ¶¶ 98, 104, 110.  Where, as here, the plaintiff does not have direct evidence of discrimination and the employer denies that the termination was motivated by a protected characteristic, and

---

[160] It is not clear that Michel has a "handicap" within the meaning of Massachusetts law.  An individual has as "handicap" if he (1) has a substantial impairment that substantially limits one or more major life activities; (2) has a record of such a physical or mental condition; or (3) is regarded by the employer as having such a condition.  Gauthier v. Sunhealth Specialty Services, Inc., 555 F. Supp. 2d 227, 239 (D. Mass. 2008).  In any event, for purposes of summary judgment, National Grid assumes, but does not concede, that Michel has a handicap within the meaning of Massachusetts law.  Docket No. 107 at 9, n. 4.  This Court does so as well.

[161] In his opposition to National Grid's motion for summary judgment, Michel raises, for the first time, a failure to accommodate claim.  See Docket No. 116-2 at 2, 4-5; Michel Aff. at ¶¶ 7-14. Michel's complaint, however, did not allege failure to accommodate.  Accordingly, he cannot avoid summary judgment by raising untimely new claims at this stage.  See Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 76 (1st Cir. 2016) (citations omitted) ("Plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment' . . . Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually  pled.").

contends that the action was based on other conduct by the employee, such as job performance, the Court analyzes his claims under the burden-shifting framework that the United States Supreme Court set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Gannon v. City of Boston, 476 Mass. 786, 793 (2017); Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000) (citations omitted).

Under the first stage of the McDonnell Douglas framework, Michel bears the burden of producing evidence of a prima facie case of discrimination that would allow a jury to infer that: (1) he is a member of a protected class protected by M.G.L. c. 151B; (2) he performed his job at an acceptable level; (3) he was terminated.  Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 681 (2016).  At the second stage, if Michel successfully makes out a prima facie case, "the burden of production shifts to the employer to articulat[e] a legitimate, nondiscriminatory reason" for its decision to take the adverse action.  Yee v. Massachusetts State Police, 481 Mass. 290, 302 (2019).  The burden on the employer at this stage is not onerous.  Id.  Even if the reasons given are arguably suspect, so long as National Grid has produced a lawful reason backed by some credible evidence, it has satisfied this burden.  Id.

Finally, if National Grid carries its burden of rebutting Michel's prima facie case with a nondiscriminatory explanation for its decision to terminate him, then the burden of production shifts back to Michel to "produce evidence that the employer's articulated justification [for the adverse action] is not true but a pretext."  Id. (citations omitted).  Michel may satisfy this burden by offering evidence which, when viewed in the light most favorable to Michel, is sufficient to convince a jury that the reasons National Grid offered for his termination were not the real reasons, thereby inviting the inference that discrimination was the motivating reason.  Id.

National Grid argues that Michel cannot establish a prima facie case of discrimination

because he is unable to show that he was performing his job at an acceptable level.  Docket No.

107 at 10, 12.  However, where, as here, the employer relies on deficient job performance as its

legitimate, nondiscriminatory reason for the termination, this Court may not "consider the

employer's alleged nondiscriminatory reason for taking an adverse employment action when

analyzing the *prima facie* case," because doing so would "bypass the burden-shifting analysis

and deprive the  plaintiff of the opportunity to show that the nondiscriminatory reason was in

actuality a pretext designed to mask discrimination."  Melendez v. Autogermana, Inc., 622 F.3d

46, 51 (1st Cir. 2010) (citations omitted).  Thus, because National Grid invoked Michel's failure

to meet the expectations of his position in arguing that he was discharged for nondiscriminatory

reasons, see Docket No. 107 at 17-18, this Court cannot rely on his allegedly deficient job

performance in assessing whether he satisfied the second prong of the prima facie case.

 In any event, whether this Court considers Michel's job performance as part of the prima

facie case or as part of the pretext analysis, Michel has not put forth any evidence to create a

triable issue of fact on this issue.  Michel has not pointed to any admissible or credible evidence

that his job performance was up to standard or that his deficient job performance was not the real

reason for his termination.

 In support of his argument that his termination was not due to poor performance, Michel

alleges that his performance review showed that he performed his job at an acceptable level for

the first six years of employment.  See Michel Aff. at ¶¶ 17-18.  Even if that is true, the record

shows that Michel's job performance issues did not begin until his seventh year of employment,

2015, after he was promoted to manager.  See generally SOF ¶¶ 36-51.  Michel has not pointed

to any evidence that would rebut National Grid's allegations in that respect.

 Michel also claims that the PIP was "fraudulent" and that he "never recognized" it "to be

legitimate or exist." Michel Aff. at ¶ 40. While Michel may have disagreed with the need for a

PIP, his disagreement does not dispute the fact that a PIP was in place because National Grid

believed that Michel's job performance as a manager was deficient. Michel simply asks this

Court to disregard the evidence regarding his inadequate job performance and credit his own

assessment of his job performance. This is insufficient to defeat summary judgment. See

Melendez, 622 F.3d at 53 (granting summary judgment because no reasonable fact finder could

conclude that employer did not actually believe that plaintiff was performing below expectations

at the time of his dismissal).

In addition, Michel appears to argue that the reason given for his termination was

pretextual because National Grid violated its own standards in terminating him. According to

Michel, National Grid's policies provided that an employee must exhibit two years of successive

inferior performance before he or she can be terminated on the ground of deficient job

performance. See Michel Aff. at ¶ 18. According to Michel, National Grid terminated him only

one month after evaluation. Id. at ¶ 19. However, the record shows that National Grid

terminated Michel nearly one year after the first PIP and two months after the second PIP. See

SOF ¶¶ 52, 64, 82, 85, 88. In addition, Michel has provided no evidence of any such company

policy.

Finally, Michel appears to argue pretext by suggesting that National Grid did not fire

other employees with worse job performance than him. See Michel Aff. at ¶ 20. Specifically,

Michel alleges that:

> It should be noted that the job performance rating I received was not the
> lowest in the company. Other white counterparts had lower ratings than
> mine and for longer periods of time, yet those other individual [sic] were
> not fired. One such employee was a bus driver whose name is Dan.

Id. Such vague, unsupported allegations are insufficient to create an issue of fact regarding

pretext.  See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997) (citations

omitted) (In order to show pretext with evidence that similarly situated employees were treated

differently, the plaintiff must "identify and relate specific instances where persons similarly

situated 'in all relevant aspects,' were treated differently.").  Accordingly, National Grid is

entitled to summary judgment on Michel's claims that he was terminated because of a disability,

his race, and/or his national origin.

      C.      Issues Of Fact Preclude Summary Judgment On Michel's Hostile
                  Work Environment Claim Based On His Race And National Origin

      Michel also alleges that he was subjected to a hostile work environment due to a

disability, his race, and/or his national origin.  See Complaint at ¶¶ 97, 103, 109.  "A hostile

work environment is one that is pervaded by harassment or abuse, with the resulting

intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full

participation of an individual in the workplace."  Cuddyer v. Stop & Shop Supermarket Co., 434

Mass. 521, 532 (2001) (quotation omitted).  "'[S]imple teasing, offhand comments, and isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the terms and

conditions of employment' to show an objectively hostile or abusive workplace environment."

Baer v. Montachusett Regional Tech. School Dist., 380 F. Supp. 3d 143, 150 (D. Mass. 2019)

(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

      To succeed on a hostile work environment claim, the plaintiff must establish that (1) he is

a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the

harassment was based upon the protected class status; (4) the harassment was sufficiently severe

or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work

environment; (5) the objectionable conduct was both objectively and subjectively offensive, so

that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to

be so; and (6) some basis for employer liability has been established.  Roy v. Correct Care

Solutions, LLC, 914 F.3d 52, 62 (1st Cir. 2019) (quoting O'Rourke v. City of Providence, 235

F.3d 713, 728 (1st Cir. 2001)).[162]

To determine whether there is a hostile work environment, a court considers the totality

of the circumstances, examining factors such as the "frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  Id. (quoting

Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998)).  The fact-specific nature of the

analysis often renders the determination of whether there was a hostile work environment best

suited for a jury.  Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006).

Michel alleges that he was subjected to a hostile work environment on the basis of his

race and national origin based on (1) what he described as "dismissive body language;" (2) the

alleged use of the N-word by Williams on two occasions;[163] and (3) Williams allegedly making

fun of his accent.[164]  Docket No. 109-1 at 34, 36-38, 39.  National Grid argues that Michel's

allegations are the kinds of offhand jokes, comments, and isolated incidents that do not give rise

to a hostile work environment claim.  See Docket No. 107 at 14-15.

---

[162] Roy involved a Title VII claim.  However, "as it is the 'practice of the Supreme Judicial Court of Massachusetts to apply federal anti-discrimination case law when construing M.G.L. c. 151B,' the analysis of state and federal employment discrimination claims follows essentially the same path."  Cherkaoui v. City of Quincy, 213 F. Supp. 3d 264, 276 (D. Mass. 2016) (citation omitted).

[163] Michel also testified that Williams used the term in front of another employee, who reported it to Michel.  Docket No. 109-1 at 40.  However, that part of the testimony does not appear to be admissible for purposes of summary judgment.

[164] Although National Grid denies these allegations, this Court must credit Michel's deposition testimony at summary judgment.  See Straughn v. Delta Air Lines, 250 F.3d 23, 35 (1st Cir. 2001) (citation omitted).

While Michel's complaints about "dismissive body language" are too vague and unspecific to support a hostile work environment claim, the remaining allegations are sufficient to survive summary judgment.  "[A] single act of harassment may, if egregious enough, suffice to evince a hostile work environment."  Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005).  "The word 'nigger' has unique meaning that makes its use particularly egregious." Toussaint v. Brigham and Women's Hospital, Inc., 166 F. Supp. 3d 110, 116 (D. Mass. 2015) (citing cases).  Indeed, "[i]t is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.  This word is 'perhaps the most offensive and inflammatory racial slur in English . . . a word expressive of racial hatred and bigotry.'"  Chery v. Sears, Roebuck and Co., 98 F. Supp. 3d 179, 193 (D. Mass. 2015) (citation omitted).  Thus, Michel's allegations about the use of this word, especially in conjunction with the allegations about his superiors making fun of his accent and even instructing him not to speak in public because of his accent, are sufficiently humiliating and stigmatizing to pose a "formidable barrier to the full participation of [Michel] in the workplace." Cuddyer, 434 Mass. at 532.  Nevertheless, there is no evidence that the alleged harassment was in any way connected to Michel's alleged disability.  See, e.g., Buono v. Della Cioppa, No. 03-40142-FDS, 2006 WL 8458639, at *9 (D. Mass. Mar. 24, 2006) (granting summary judgment in favor of employer on hostile work environment claim where there was no evidence that allegedly harassing conduct was based on plaintiff's disability).  Therefore, I recommend that Judge Sorokin deny National Grid's motion for summary judgment on Michel's hostile work environment claims based on his race and national origin but grant it to the extent that it is based on Michel's alleged disability.

D.     Michel Has Failed To Provide Sufficient Evidence
       To Make Out A Prima Facie Case Of Retaliation

To make out a prima facie case of retaliation, Michel must show that (1) he engaged in

protected conduct, (2) he suffered some adverse action, and (3) a causal connection existed

between the protected conduct and the adverse action.  See Mole v. Univ. of Mass., 442 Mass.

582, 591-592 (2004).  National Grid argues that Michel is unable to show a causal connection

between the protected conduct and the adverse action.  Docket No. 107 at 15-17.  I agree.

Michel alleges that he engaged in protected conduct "many times" by filing grievances

and complaining about discrimination.  See Michel Aff. at ¶ 16.  The record is devoid, however,

of any evidence of such grievances or of any protected conduct prior to October 12, 2016, when

he met with William Holzhauer, National Grid's U.S. Director of Ethics and Compliance.  See

Affidavit of William Holzhauer (Docket No. 114) ("Holzhauer Aff.") at ¶ 3.  At that meeting,

Michel spoke about the PIPs and stated that he felt he was being treated unfairly.  Id.  Then, on

November 2, 2016, Michel filed an internal grievance with National Grid's 24-hour Alertline.

SOF ¶ 87.  National Grid has presented evidence that Moore, who made the decision to terminate

Michel, was not aware of Michel's complaints when he made that decision.  See SOF ¶ 88.

Michel has presented no evidence to dispute National Grid's assertions.

Moreover, the undisputed facts show that well before his complaint to Holzhauer, Michel

was put on a PIP, was given a negative performance review, and was placed on a second PIP.

"Where, as here, adverse employment actions or other problems with an employee predate any

knowledge that the employee has engaged in protected activity, it is not permissible to draw the

inference that subsequent adverse actions, taken after the employer acquires such knowledge, are

motivated by retaliation."  Mole, 442 Mass. at 340.  Because it is undisputed that Michel's

performance management began long before he engaged in any protected action, there is no basis

for inferring that his termination was causally connected to the protected conduct.  Accordingly, National Grid is also entitled to summary judgment in its favor on Michel's retaliation claim.[165]

     E.    <u>FMLA Claims</u>

The FMLA provides an employee suffering from a serious injury or medical condition up to twelve weeks of protected leave, in a twelve-month period.  <u>Chase v. United States Postal Serv.</u>, 843 F.3d 553, 556 (1s Cir. 2016) (citing 29 U.S.C. § 2612(a)(1)(D)).  Upon the employee's return, his employer must reinstate him to the same or an equivalent position, without any loss of accrued seniority.  <u>Carrero-Ojeda v. Autoridad de Energia Electrica</u>, 755 F.3d 711, 718 (1st Cir. 2014) (citations omitted).

To protect these rights, the FMLA and its accompanying regulations make it unlawful for an employer to, among other things "interfere with, restrain, or deny the exercise" of any FMLA right, or retaliate against an employee for exercising his FMLA rights.  <u>Id.</u> at 718, 719. Therefore, an employer may not use an employee's FMLA leave as a negative factor in deciding to hire, fire, promote, or provide benefits to an employee.  <u>Id.</u> at 719 (citations omitted). "However, while an employee may not be penalized for exercising [his] rights under the statute, an employee may nevertheless be discharged, not promoted, or denied benefits for independent reasons during or after [his] taking of FMLA leave."  <u>Id.</u> (citation omitted).  Michel alleges both that National Grid interfered with his FMLA rights and that it retaliated against him for taking FMLA leave.  <u>See</u> Complaint at ¶¶ 116-125.

With interference claims, "[t]he key issue is simply whether the employer provided its employee with the benefits to which [he] was entitled per the FMLA."  <u>Carrero-Ojeda</u>, 755 F.3d

---

[165] Even if Michel had provided sufficient evidence to make out a prima facie case of retaliation, he is unable to show pretext for the same reasons set forth above in connection with his discrimination claims.

at 722 (citing Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)).  "Such

claims include not only outright denials of substantive rights, but also other actions by an

employer that prevent or even 'deter' employees from exercising their rights."  Lufkin v. Eastern

Maine Med. Center, No. 05-106-B-H, 2006 WL 1892442, at *11 (D. Me. July 7, 2006) (citations

omitted).

Michel argues that National Grid interfered with his right to take FMLA leave by

continuously calling him while he was on leave and asking him when he would return to work.

See Michel Aff. at ¶¶ 24-27.  He also alleges that Moore threatened to replace him if he did not

call him back with a return to work date.  Id. at ¶ 26.  In order for an employer's unwanted

communications during FMLA leave to provide a basis for an interference claim, however, the

employee must show that the employer required the employee to do work while the employee

was on leave.  See, e.g., Persson v. Boston Univ., No. 15-14037-JGD, No. 15-14037-JGD, 2019

WL 917205, at *18 (D. Mass. Feb. 25, 2019) (citing cases); Antekeier v. Lab. Corp. of Am., 295

F. Supp. 3d 679, 684 (E.D. Va. 2018) ("A sensible construction of actionable interference in the

context of the FMLA plainly does not include situations where an employee on leave was

contacted by her employer or a co-employee for some purpose other than to do work.").  Michel

has admitted that he was never asked to do any work while on leave.  See Michel Aff. at ¶ 25.

Moreover, he has not alleged that he was unable to take all of the medical leave he requested.

See, e.g., Lufkin, 2006 WL 1892442, at *12 (finding no interference despite employer's calls

where plaintiff was able to take all of the family medical leave he requested); see also Gudava v.

Northeast Hosp. Corp., 440 F. Supp. 3d 49, 61 (D. Mass. 2020) ("[T]he FMLA does not provide

relief unless an employee is prejudiced by any employer's interference.").  Therefore, I find that

Michel has not presented sufficient evidence to support an interference claim.

Michel's FMLA retaliation claim also fails.  That claim too is evaluated under the McDonnell Douglas burden-shifting standard.  See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335 (1st Cir. 2005).  For the same reasons stated above with respect to his retaliation claim under Massachusetts law, Michel has not presented any evidence to show a causal connection between his termination and his FMLA leave, or to show pretext.  Accordingly, National Grid is entitled to summary judgment on Michel's FMLA claims as well.

IV.    RECOMMENDATION

For the foregoing reasons, I recommend that Judge Sorokin grant in part and deny in part the motion.  Specifically, I recommend that Judge Sorokin grant summary judgment in favor of National Grid on all of Michel's claims, except for the hostile work environment claims based on Michel's race and national origin.

V.    REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of service of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hospital, 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983

F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge